# In the United States Court of Federal Claims

No. 15-824T
(Filed:  October 7, 2016)

|  |  |  |
|---|---|---|
| DREAMWORKS ANIMATION SKG, INC., and SUBSIDIARIES, | ) ) ) | |
| Plaintiff, | ) ) ) | Tax Refund Suit; Summary Judgment; RCFC 56; American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 |
| v. | ) ) ) | Stat. 1418 (2004); Extraterritorial Income; Effective Date Provision; |
| THE UNITED STATES, | ) ) | Transition Rule; Savings Clause |
| Defendant. | ) ) | |

*Miriam L. Fisher*, Washington, DC, for plaintiff.  *Brian C. McManus* and *Nicolle N. Gibbs*, Washington, DC, of counsel.

*Robert J. Higgins*, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, DC, with whom were *Caroline D. Ciraolo*, Acting Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, *G. Robson Stewart*, Assistant Chief, Court of Federal Claims Section, and *Blaine G. Saito*, Trial Attorney, Court of Federal Claims Section, for defendant.

**O P I N I O N**

**FIRESTONE**, *Senior Judge.*

Pending before the court in the above-captioned tax refund case are cross-motions

for summary judgment filed pursuant to Rule 56 of the Rules of the Court of Federal

Claims ("RCFC") by plaintiff DreamWorks Animation SKG, Inc., and Subsidiaries

("DreamWorks")[1] and defendant the United States ("the government").  At issue is

---

[1] During this litigation, plaintiff was acquired by Comcast Corporation and plaintiff's name changed to "DWA Holdings LLC."  *See* Rule 7.1 Disclosure Supplemental Statement filed Sept.

whether DreamWorks is entitled to continued tax benefits under section 101(d) of the

American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418 (2004)

("AJCA") with regard to extraterritorial income DreamWorks recognized in 2007, 2008,

and 2009 from a licensing agreement that DreamWorks entered into in 2006.

From the 1970s to the 2000s, Congress provided tax exemptions for domestic

companies like DreamWorks that sold products abroad.  The tax exemptions were

challenged before the World Trade Organization ("WTO") as protectionist.[2]  In 2004, the

---

19, 2016 (ECF No. 23); Notice of Plaintiff Name Change filed Sept. 19, 2016 (ECF No. 24).  For consistency, the court refers to plaintiff as "DreamWorks" throughout this opinion.

[2] Title V of the Revenue Act of 1971, Pub. L. No. 92-178, §§ 501-507, 85 Stat. 497, 535-53, established rules for taxation of "domestic international sales corporations" (the "DISC regime"). In 1976, a General Agreement on Tariffs and Trade ("GATT") panel concluded that the domestic international sales corporations regime provided a prohibited export subsidy.  *See* Panel Report, United States—Tax Legislation (DISC), L/4422 (Nov. 2, 1976).

Title VIII of the Tax Reform Act of 1984, Pub. L. No. 98-369, Div. A, §§ 801-805, 98 Stat. 494, 985-1003, largely replaced the domestic international sales corporations regime with the "foreign sales corporation" ("FSC") regime.  *See generally Boeing Co. v. United States*, 537 U.S. 437, 440-42 (2003) (discussing the history of the domestic international sales corporations regime and the foreign sales corporation regime).  According to the government, section 802 of the Tax Reform Act of 1984, titled "Interest Charge DISC," amended the remaining portion of the domestic international sales corporations regime to address the GATT panel's concerns.  *See* Def.'s Reply 5-6.  In 1999, a panel of the WTO's Dispute Settlement Body found that the foreign sales corporation regime, like the domestic international sales corporations regime, was a prohibited export subsidy.  *See* Panel Report, United States—Tax Treatment for "Foreign Sales Corporations," WTO Doc. WT/DS108/R (adopted Oct. 8, 1999). The WTO's appellate body agreed.  *See* Appellate Body Report, United States—Tax Treatment for "Foreign Sales Corporations," WTO Doc. WT/DS108/AB/R (adopted Feb. 24, 2000).

The FSC Repeal and Extraterritorial Income Exclusion Act of 2000, Pub. L. No. 106-519, 114 Stat. 2423, generally repealed the foreign sales corporation regime, *see CBS Corp. v. United States*, 105 Fed. Cl. 74, 76 (2012), and established new rules for an extraterritorial income ("ETI") tax regime.  The extraterritorial income tax regime was then successfully challenged before the WTO.  *See* Panel Report, United States—Tax Treatment for "Foreign Sales Corporations"—Recourse to Article 21.5 of the DSU by the European Communities, WTO Doc. WT/DS108/RW (adopted Aug. 20, 2001); Appellate Body Report, United States—Tax Treatment for "Foreign Sales Corporations"—Recourse to Article 21.5 of the DSU by the

extraterritorial income tax exemption, which is the focus of this case, was repealed by the AJCA. *See* AJCA § 101(a).

Congress included several provisions in the AJCA in connection with implementing the repeal of the extraterritorial income tax exemption. AJCA section 101(c), titled "effective date," provided that the repeal would apply to "transactions after December 31, 2004." Congress also included the transition provision at issue in this case, in AJCA section 101(d), titled "transitional rule for 2005 and 2006." The transition rule stated that "[i]n the case of transactions during 2005 or 2006, the amount includible in gross income by reason of the amendments made by this section shall not exceed the applicable percentage of the amount which would have been so included but for this subsection." ACJA § 101(d)(1). The statute then defined the "applicable percentage" as 20 percent "[f]or 2005" and as 40 percent "[f]or 2006." ACJA § 101(d)(2).[3] Finally, the

---

European Communities, WTO Doc. WT/DS108/AB/RW (adopted Jan. 14, 2002); *see also WTO's Extraterritorial Income Decision: Hearing Before the H. Comm. on Ways and Means*, 107th Cong. 14-17 (2002) (statement of Peter Davidson, General Counsel, Office of the United States Trade Representative).

[3] The conference committee adopted the transition rule from the House Ways and Means Committee's bill, which was summarized in H.R. Rep. No. 108-548(I), at 114-15 (2004). *See* H.R. Rep. No. 108-755, at 263-65 (2004) (Conf. Rep.). In its report, the House Committee stated that the reason for the repeal of extraterritorial income tax benefits was that "it is important that the United States, and all members of the WTO, comply with WTO decisions and honor their obligations under WTO agreements." H.R. Rep. No. 108-548(I), at 114. The report continued, "[t]he Committee believes that it is necessary and appropriate to provide transition relief comparable to that which has been included in the past in measures taken by WTO members to bring their laws into compliance with WTO decisions and obligations." *Id.* The report stated that "[f]or transactions prior to 2005, taxpayers retain 100 percent of their [extraterritorial income tax] benefits." *Id.* The report further stated that "[f]or transactions after 2004, the provision provides taxpayers with 80 percent of their otherwise-applicable [extraterritorial income tax] benefits for transactions during 2005 and 60 percent of their otherwise-applicable [extraterritorial income tax] benefits for transactions during 2006." *Id.*

AJCA included a "grandfather" or "savings" provision in section 101(f), which stated

that "[t]he amendments made by this section shall not apply to any transaction . . . which

occurs pursuant to a binding contract . . . which is in effect on September 17, 2003, and at

all times thereafter."  The provision went on to define the term "binding contract" to

"include a purchase option, renewal option, or replacement option which is included in

such contract . . . ."  ACJA § 101(f).

This case turns on the scope of section 101(d), the transition rule for 2005 and

2006.  DreamWorks argues that the transition rule in section 101(d) applies to

extraterritorial income generated from any transaction entered into during 2005 and 2006

regardless of when the income is recognized.  According to DreamWorks, so long as the

transaction giving rise to the extraterritorial income, such as DreamWorks's licensing

agreement, was entered into in 2005 or 2006, the extraterritorial income recognized from

the transaction is subject to the reduced percentages of amount includible in gross income

subject to tax that are set forth in section 101(d)(2).  Thus, DreamWorks argues that the

extraterritorial income it recognized in 2007, 2008, and 2009 from a licensing agreement

that DreamWorks entered into in 2006 is covered by the transition rule.  Based on its

reading of section 101(d), DreamWorks asserts that it is entitled to a refund of

$3,441,647 for 2007 and $957,413 for 2008, plus interest.

The government argues that the transition rule in section 101(d) of the AJCA does

not provide for the continued tax benefit DreamWorks seeks.  According to the

government, the transition provision was intended to provide for the orderly

implementation of the repeal of the extraterritorial income tax exemption for a period of

two years only and was not intended to provide a long-term tax break.  Put another way, the government argues that the transition rule was not intended to serve as a savings provision for extraterritorial income generated from transactions entered into in 2005 and 2006, and recognized in later years, in order to protect taxpayers from the AJCA's repeal of the extraterritorial income tax exemption.  Rather, the government asserts that extraterritorial income tax benefits under the transition rule expired at the end of 2006. As such, the government argues that DreamWorks is not entitled to refunds based on extraterritorial income that DreamWorks recognized in 2007, 2008, and 2009.

For the reasons discussed below, DreamWorks's motion for summary judgment is **DENIED** and the government's motion for summary judgment is **GRANTED**.

## I.  FACTUAL BACKGROUND

DreamWorks, during the relevant time period, was a Delaware corporation with its principal place of business in Glendale, California.  Compl. ¶ 2; Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s MSJ Mem.") 3.  Also for the relevant period, DreamWorks was the parent of a group of corporations that filed a consolidated income tax return on a calendar year basis.  Compl. ¶ 4; Pl.'s MSJ Mem. 3.

The only transaction at issue in this case occurred in 2006.  Compl. ¶ 15; Pl.'s MSJ Mem. 4-5.[4]  On January 31, 2006, DreamWorks entered into an agreement to distribute certain DreamWorks-produced animated feature films outside of the United

---

[4] It is undisputed that DreamWorks's 2006 distribution agreement was a "transaction" for the purposes of extraterritorial income tax benefits and AJCA section 101(d).  Pl.'s MSJ Mem. 21; Def.'s Mem. in Supp. of Cross-Mot. for Summ. J. ("Def.'s MSJ Mem.") 2-4.

States.  Compl. ¶¶ 14-15; Pl.'s MSJ Mem. 4-5.  Pursuant to the 2006 distribution

agreement, the licensees of those films paid DreamWorks a defined royalty for so long as

the films continued to be used by the licensees outside of the United States for the term of

the distribution agreement.  Compl. ¶ 18; Pl.'s MSJ Mem. 4-5.  The term of the

distribution agreement extended ten years or more, varies by film, and was based, among

other things, on the timing of availability of each film for delivery.  Pl.'s MSJ Mem. 5.

On January 20, 2012, DreamWorks submitted refund claims to the Internal

Revenue Service ("IRS") for 2007, 2008, and 2009 based on asserted extraterritorial

income tax benefits.  Compl. ¶ 28; Pl.'s MSJ Mem. 6; Def.'s Mem. in Supp. of Cross-

Mot. for Summ. J. ("Def.'s MSJ Mem.") 4, 11.[5]  On November 3, 2014, the IRS

disallowed DreamWorks's claims and demanded that DreamWorks pay a deficiency.

Compl. ¶ 31-33.  The IRS's decision was consistent with non-precedential IRS guidance

interpreting AJCA section 101(d)'s transition rule "as applying to income recognized

during the 2005 and 2006 calendar years from transactions entered into during those

years."  Chief Counsel Attorney Memorandum, IRS AM 2007-001, at 4 (Jan. 12, 2007).[6]

DreamWorks paid the demanded amount.  Compl. ¶ 33; Def.'s MSJ Mem. 4.

---

[5] During an audit, DreamWorks and the IRS had agreed to extend the period during which an
assessment of any deficiency could be made for tax years 2007, 2008, and 2009 pursuant to
section 6501(c)(4) of the Internal Revenue Code ("IRC").  Compl. ¶ 29.  The period for filing
refund claims for those tax years was also extended under IRC section 6511(c)(1).  *Id.*

[6] The IRS has provided guidance discussing its interpretation of section 101(d) since 2007.  In
Chief Counsel Attorney Memorandum, IRS AM 2007-001, at 4, the IRS stated that "for
transactions entered into during 2005 and 2006, taxpayers may claim 80% and 60%,
respectively, of the ETI exclusions that would have been permitted but for the repeal ("phase-out
rule") with respect to the income recognized during those calendar years."  The IRS then
explained that although it interpreted the effective date provision in section 101(c) of the AJCA

## II.     PROCEDURAL HISTORY

DreamWorks filed its complaint in this court on August 3, 2015 and filed its

motion for summary judgment on February 19, 2016 (ECF No. 17).  The government

filed its cross-motion for summary judgment and response to DreamWorks's motion for

summary judgment on March 21, 2016 (ECF No. 18).  DreamWorks filed its reply in

support of its motion for summary judgment and response to the government's cross-

motion for summary judgment on April 15, 2016 (ECF No. 19), and the government filed

its reply on May 13, 2016 (ECF No. 20).  Oral argument was held on September 15,

2016.

## III.    JURISDICTION AND LEGAL STANDARD

This court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), to hear

claims for a refund of tax alleged to have been erroneously or illegally assessed or

collected.  *See RadioShack Corp. v. United States*, 566 F.3d 1358, 1360 (Fed. Cir. 2009);

*Hinck v. United States*, 64 Fed. Cl. 71, 74-76 (2005) (citations omitted), *aff'd*, 446 F.3d

1307 (Fed. Cir. 2006), *aff'd*, 550 U.S. 501 (2007).[7]

---

to apply "on a transaction-by-transaction basis," providing continued benefits for the life of
transactions entered into before 2005, "the Service interprets the phase-out rule [section 101(d)]
as applying to *income* recognized during the 2005 and 2006 calendar years from transactions
entered into during those years."  *Id.* at 5 (emphasis added); *see also* Chief Counsel Advisory,
IRS CCA 201625011, at 6 n.4 (June 17, 2016); Chief Counsel Attorney Memorandum, IRS AM
2009-009, at 5 (Sept. 18, 2009); Chief Counsel Attorney Memorandum, IRS AM 2008-008, at 4
(July 11, 2008); Chief Counsel Advice, IRS CCA 200813041, at 5 (Mar. 28, 2008).

[7] Under IRC section 7422, "[n]o suit . . . shall be maintained in any court for the recovery of any
internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . until a
claim for refund or credit has been duly filed with" the IRS.  *United States v. Clintwood Elkhorn
Mining Co.*, 553 U.S. 1, 7 (2008).  It appears to be undisputed that DreamWorks's amended
income tax returns were defective because those returns were not signed.  Def.'s MSJ Mem. 4,

Pursuant to RCFC 56, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The parties agree that there are no disputed facts in this case, which turns solely on a matter of statutory interpretation. Pl.'s MSJ Mem. 3; Def.'s MSJ Mem. 2-3.

## IV.   DISCUSSION

### A.   The Plain Language and Structure of AJCA Section 101(d) Limit its Tax Benefits to Extraterritorial Income Recognized in 2005 and 2006.

In the context of construing statutes, and in particular tax laws, this court is guided by several principles. First, in construing a tax statute, the court is bound by the language of the statute and must apply that language if it is unambiguous. *See, e.g.*, *Energy E. Corp. v. United States*, 645 F.3d 1358, 1361 (Fed. Cir. 2011) ("When interpreting a statute, '[t]he starting point . . . is the language itself.'" (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 (1977))). Second, the court must narrowly construe special tax exemptions. *See, e.g.*, *Bartels Tr. for the Benefit of Cornell Univ. ex rel. Bartels v. United States*, 617 F.3d 1357, 1362 n.2 (Fed. Cir. 2010) ("[D]eductions and other tax benefits are construed narrowly because they are a matter of legislative grace; they are

---

11. Nonetheless, the government explains that this court has jurisdiction pursuant to the "informal claim doctrine" expressed by the Supreme Court and the Federal Circuit. Def.'s MSJ Mem. 11 (citing *United States v. Dalm*, 494 U.S. 596, 601-02 (1990); *Tucker v. Alexander*, 275 U.S. 228, 231-32 (1927)). The Federal Circuit has found that "[u]nder the informal claim doctrine, a timely claim with purely formal defects is permissible if it fairly apprises the IRS of the basis for the claim within the limitations period." *Computervision Corp. v. United States*, 445 F.3d 1355, 1364-65 (Fed. Cir. 2006) (citing *United States v. Kales*, 314 U.S. 186 (1941)), *adhered to on denial of reh'g*, 467 F.3d 1322 (Fed. Cir. 2006). In this case, the court has jurisdiction because DreamWorks's timely claims were formally rejected by the IRS, the IRS issued a demand for payment, and DreamWorks paid the amount demanded before filing this action. *See* Def.'s MSJ Mem. 11.

exceptions to the general rule that all income is taxable." (citing IRC § 61; *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1375 (Fed. Cir. 2010))); *see also Nat'l Data Corp. & Subsidiaries v. United States*, 50 Fed. Cl. 24, 27 (2001) (applying "[t]his oft-quoted tax maxim" to a tax transition rule (citations omitted)), *aff'd*, 291 F.3d 1381 (Fed. Cir. 2002) (per curiam).  Third, the court must ensure that the words of a statute are read "in their context and with a view to their place in the overall statutory scheme."  *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

In its motion for summary judgment, DreamWorks argues that because AJCA section 101(d)'s transition rule applies "[i]n the case of transactions during 2005 or 2006," the tax relief provided in that provision applies to extraterritorial income generated from those transactions for the life of the transaction, even if the income is recognized after 2006.  DreamWorks argues that its reading is compelled by the plain language and structure of the transition rule.  Specifically, DreamWorks argues based on the last antecedent rule of statutory construction that the court must construe the words "[f]or 2005" and [f]or 2006" in AJCA section 101(d)(2) to mean "for transactions entered into during 2005 or 2006."  Pl.'s MSJ Mem. 17-18.  DreamWorks argues that the antecedent in section 101(d)(1) focuses on transactions, and not income, and therefore the words "[f]or 2005" and [f]or 2006" relate back to transactions entered into during those years.  Based on this reading, DreamWorks argues that Congress intended to provide ongoing extraterritorial income tax benefits under section 101(d) for the life of transactions entered into during 2005 or 2006.

DreamWorks contends that its reading of section 101(d) is confirmed by the effective date provision in section 101(c), which also refers to "transactions" and which the IRS in guidance has construed as providing tax relief "on a transaction-by-transaction basis," or for the life of transactions entered into before 2005. *See, e.g.*, Chief Counsel Attorney Memorandum, IRS AM 2007-001, at 5. DreamWorks also relies on the wording of the savings provision in section 101(f), which has also been interpreted by the IRS to provide benefits for the life of transactions entered into by a certain date. *See, e.g.*, *id.* at 4. DreamWorks asserts that these provisions should be read together, *in pari materia*, as full or partial exemptions to the general repeal of extraterritorial income tax benefits for transactions entered into before certain dates without regard to when resulting income might be recognized.

Finally, DreamWorks argues that its reading of section 101(d) is supported by a review of section 102 of the AJCA, which established a new tax deduction for income attributable to "domestic production activities" and provided a transition rule for 2005 through 2009. Dreamworks argues that the language of the transition provision in section 102 of the AJCA demonstrates that when Congress intended to focus on taxable years it did so expressly and did not use the word "transaction."[8]

---

[8] Section 102(a)(1) of the AJCA provided that "[t]here shall be allowed as a deduction an amount equal to 9 percent of the lesser of (A) the qualified production activities income [as defined later in the statute] of the taxpayer for the taxable year, or (B) taxable income (determined without regard to this section) for the taxable year."

Section 102(a)(2), titled "phasein," provided that:

In the case of any taxable year beginning after 2004 and before 2010, paragraph (1) and subsections (d)(1) and (d)(6) shall be applied by substituting for the

The government argues that DreamWorks's reading of section 101(d) is not compelled or supported by the language and structure of the AJCA. Specifically, the government argues that the transition rule in section 101(d) was not intended to be a savings provision and instead established a limited, two-year phase-out of extraterritorial income tax benefits for transactions entered into in 2005 and 2006, after the effective date of the repeal of the extraterritorial income tax regime. The government argues that the tax benefit established in the transition provision expired at the end of 2006. According to the government, the transition provision does not state or imply that extraterritorial income recognized after 2005 or 2006 will not be includible in taxable gross income.

The government explains that Congress would not have enacted a separate savings provision in section 101(f), for binding contracts "in effect on September 17, 2003, and at all times thereafter," if Congress had intended section 101(d) to serve that purpose. The government notes that the phrase "binding contract" is expressly defined to include an option contract that extended beyond the effective date of the repeal of extraterritorial income tax benefits. The government argues, from the different language Congress used in section 101(d) as compared to section 101(f), that Congress did not intend for section 101(d) to be a savings provision extending a tax exemption to certain taxpayers beyond 2006. Instead, the government concludes, in section 101(d) Congress chose to give

---

percentage contained therein the transition percentage determined under the following table:

| For taxable years beginning in: | The transition percentage is: |
|---|---|
| 2005 or 2006 ......................................................................................................3 | |
| 2007, 2008, or 2009 ............................................................................................6 | |

taxpayers that entered into transactions after the repeal of the extraterritorial income tax exemption two years of limited tax relief.  In this connection, the government notes that transition rules are different from savings provisions in that transition rules generally do not implicate pre-enactment activity, but provide limited relief after new rules take effect.

Based on the plain language and structure of AJCA section 101, the court agrees with the government that the tax benefits provided in section 101(d)'s transition rule were limited to income recognized in 2005 or 2006 and did not provide taxpayers with tax relief beyond 2006.  First, contrary to DreamWorks's contentions, the court agrees with the government that "[f]or 2005" and "[f]or 2006" in AJCA section 101(d)(2) refer to the years in which extraterritorial income will be subject to the applicable percentages for tax benefits and not to years in which transactions might have been entered into.  Under the last antecedent rule, "qualifying words, phrases and clauses must be applied to the words or phrases immediately preceding them and are not to be construed as extending to and including others more remote."  *Demko v. United States*, 216 F.3d 1049, 1053 (Fed. Cir. 2000) (quoting *Wilshire Westwood Assocs. v. Atl. Richfield Corp.*, 881 F.2d 801, 804 (9th Cir. 1989)).  Section 101(d)(1) provides that "[i]n the case of transactions during 2005 or 2006, the amount includible in gross income . . . shall not exceed the applicable percentage of the amount which would have been so included but for this subsection."  Section 101(d)(2) then refers back to paragraph (1) and establishes the applicable percentage for 2005 and the applicable percentage for 2006.  The court finds that the most natural reading of section 101(d) is that the reference back to paragraph (1) relates to the "amount includible in gross income."  Only "income" can be subject to certain

percentages "[f]or 2005" and "[f]or 2006." The court thus finds that DreamWorks's reliance on the last antecedent rule is misplaced. The better reading of section 101(d)(2) is that the words "[f]or 2005" and "[f]or 2006" relate not to "transactions" but to "the amount includible in gross income" for 2005 and 2006.

Second, the court disagrees with DreamWorks's contention that the transition rule in section 101(d) of the AJCA should be read as a savings provision for transactions entered into in 2005 or 2006 when it is read in the context of section 101 and section 102. Under the *in pari materia* canon of statutory construction, "courts should interpret statutes with similar language that generally address the same subject matter together, 'as if they were one law.'" *Strategic Hous. Fin. Corp. of Travis Cty. v. United States*, 608 F.3d 1317, 1330 (Fed. Cir. 2010) (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)). However, a "saving clause within [a] repealing statute relates to accrued rights." Norman Singer & Shambie Singer, Effect of Repeal—Saving Clauses in Repealing Acts, 1A Sutherland Statutory Construction § 23:40 (7th ed.); *see also* Norman Singer & Shambie Singer, Saving Clauses, Exceptions, Provisos, 1A Sutherland Statutory Construction § 20:22 (7th ed.) ("Where the legislature has made specific exemptions, the courts must presume no others were intended."). Given the constraints placed on courts when construing tax exemptions, the court finds that section 101(d) was written narrowly and is not a savings provision for transactions entered into after AJCA's effective date. Section 101(f) of the AJCA, in contrast to section 101(d), is a savings provision which by its terms was designed to provide long-term tax benefits. Section 101(f) expressly stated that "[t]he amendments made by this section [i.e., the repeal of extraterritorial income tax

benefits] shall not apply to any transaction in the ordinary course of a trade or business which occurs pursuant to a binding contract" that was "in effect on September 17, 2003, and at all times thereafter."  The term "binding contract" was then defined to include various option agreements that met certain requirements.  Section 101(f) thus deals with grandfathering transactions entered into under pre-existing agreements.  Indeed, anticipating that transactions entered into pursuant to some pre-enactment agreements might generate income beyond the effective date, Congress in section 101(f) expressly extended extraterritorial income tax benefits for binding contracts "in effect on September 17, 2003 and at all times thereafter."  The court infers from the plain words of section 101(f) that Congress, by not using similar language in section 101(d), did not intend for the transition rule to confer long-term benefits to taxpayers who entered into transactions in 2005 or 2006 and who had the opportunity to take the tax implications into account.

The court further agrees with the government that DreamWorks's reliance on IRS guidance issued with regard to section 101(c) and section 101(f), in which the IRS has construed those provisions to extend extraterritorial income tax benefits on a transaction-by-transaction basis, is misplaced.  First and foremost, a taxpayer cannot rely on IRS written determinations as precedent.  *See* IRC § 6110(k)(3); *Montiel v. United States*, 118 Fed. Cl. 283, 288 n.8 (2014).  In addition, section 101(c), (d), and (f) did not use identical language and dealt with different time frames.  The effective date provision dealt with transactions that pre-dated the repeal of the extraterritorial income tax exemption.  The savings provision dealt with binding contracts that pre-dated the repeal.  In contrast,

section 101(d) dealt with only post-repeal transactions.  Congress's decision to apply

different rules to transactions and binding contracts that pre-dated the repeal of the

extraterritorial income tax exemption and transactions entered into after the repeal is

logical because pre-repeal transactions and binding contracts might have been negotiated

on the basis of the tax exemption whereas post-repeal transactions were made with full

knowledge of the changed tax consequences.[9]

Finally, the court does not read section 102 of the AJCA as compelling a different

reading of section 101(d).  Section 102 dealt with a new tax deduction for "income

attributable to domestic production activities" and provided a phase-in rule for "any

taxable year beginning after 2004 and before 2010."  AJCA § 102(a)(2).  The fact that

Congress used the phrase "taxable year" in section 102 and "amount includible in gross

income" in section 101(d) is of no moment.  The court reads the plain language of section

101(d) as providing "the amount includible in gross income" "[f]or 2005" and "[f]or

2006."  The fact that Congress spoke in more detail in section 102 with regard to taxable

years does not mean that Congress intended to extend tax benefits in section 101(d)

beyond 2006.

---

[9] It is for this reason that DreamWorks's contention that equity dictates that short-term and long-term transactions be treated the same must be rejected.  Congress's decision to treat income from long-term transactions that were entered into before Congress repealed the extraterritorial income tax exemption differently from the income generated from long-term transactions entered into after the repeal is not inequitable.  Section 101(d) dealt only with transactions entered into after the extraterritorial income tax exemption was repealed and provided limited tax relief for a two-year period that would allow for tax planning.  The transition rule in section 101(d) served a different purpose than the effective date or savings provision.

**B.      Nothing in the Legislative History of AJCA Section 101 or in Subsequent Legislative Action Dictates a Different Reading of the Transition Rule.**

Because the court finds that the plain language of AJCA section 101 is unambiguous and supports the government's reading of the statute, it is not necessary to consider the legislative history or later legislative action to discern the meaning or scope of the transition rule in AJCA section 101(d).  However, the court finds that even if the meaning of the transition rule were not clear from its plain language, the legislative history and subsequent legislative action confirm the government's interpretation of the statute.

DreamWorks argues that the legislative history underlying AJCA section 101(d)'s transition rule shows that Congress intended, in the transition rule, to extend extraterritorial income tax benefits beyond two years for transactions that provided income after 2006.  DreamWorks highlights that the Conference Committee in its report explained that the Committee rejected the Senate version of the transition rule and instead adopted the approach found in the House version of the transition rule.  DreamWorks then relies on the language in the House Committee report accompanying the legislation to show that the transition rule was focused on transactions and not taxable income recognized in specific tax years.  The House Committee report stated that "[t]he Committee believes that it is necessary and appropriate to provide transition relief comparable to that which has been included in the past in measures taken by WTO members to bring their laws into compliance with WTO decisions and obligations."  H.R. Rep. No. 108-548(I), at 114 (2004).  DreamWorks asserts that this language refers to the

transitional relief afforded by European Union members in the so-called "Bananas Dispute" that allowed the European Union to continue a discriminatory market access regime for nearly a decade after a WTO ruling.  Pl.'s MSJ Mem. 31.  DreamWorks argues that Congress knew or should have known that the transition rule in section 101(d) and the savings clause in 101(f) would not satisfy the WTO and thus Congress's interest in satisfying the WTO in order to avoid sanctions should be discounted.  DreamWorks also relies on language in the House Committee report which described the transition rule as "provid[ing] taxpayers with 80 percent of their otherwise-applicable [extraterritorial income tax] benefits for transactions during 2005 and 60 percent of their otherwise-applicable [extraterritorial income tax] benefits for transactions during 2006," H.R. Rep. No. 108-548(I), at 114, implying that Congress understood the transition rule would provide long-term partial extraterritorial income tax benefits to transactions entered into during 2005 or 2006 regardless of when the income might be recognized.  In this way, DreamWorks argues, Congress intended to avoid distortions between the tax treatment of sales transactions and the tax treatment of leasing or licensing transactions.  Pl.'s MSJ Mem. 32.[10]

---

[10] DreamWorks argues that it would not be equitable to treat transactions that generate income over a period of years differently from those which generate income in a single year.  The court disagrees.  As discussed above, the fact that Congress may have recognized, for transactions entered into before the repeal of the extraterritorial income tax exemption, that equity required that income from long-term transactions be treated the same as income from transactions that were completed in a single year is of no moment.  Section 101(d) of the AJCA dealt with post-repeal transactions in which parties understood the tax implications and could take into account short-term and long-term tax implications.  This was not possible for pre-repeal transactions.

DreamWorks also argues that its reading must be correct because Congress, in section 219 of the Tax Increase Prevention Act of 2014, Pub. L. No. 113-295, 128 Stat. 4010 ("TIPA"), amended the transition rule in AJCA section 101(d), treating it as "present law." DreamWorks argues that the 2014 amendment can only have real and substantial effect if the transition rule is read as providing continued extraterritorial income tax benefits in 2014.

In response, the government argues that the legislative history of the transition rule confirms that Congress intended to provide partial tax relief for only two years, 2005 and 2006. The government argues that the legislative history does not suggest that Congress adopted the House version of the transition rule over the Senate version of the transition rule to extend extraterritorial income tax benefits beyond 2006. To the contrary, the government argues that the legislative history shows that Congress did not approve of the long-term transition employed in the Bananas Dispute. *See* S. Rep. No. 108-192, at 8-9 (2003). In this regard, the government argues that the overall goal of the AJCA was to comply with adverse WTO rulings and meet obligations under WTO agreements. According to the government, Congress understood that allowing for tax benefits to extend potentially indefinitely to post-enactment transactions would not be consistent with the WTO's decisions.

With regard to subsequent legislative action, the government asserts that the 2014 amendment to section 101(d)'s transition rule was a technical correction that took effect retroactively and served to resolve a calculation problem for taxpayers with open 2005 and 2006 tax returns. The government also points out that the 2014 legislation amended

other provisions of the IRC that were generally obsolete by 2014 but could have affected the prior year returns of a few taxpayers.

Finally, the government argues that the court cannot ignore the fact that Congress, in 2006, repealed section 101(f) in response to WTO objections but left section 101(d) in place because the WTO and Congress understood that the transition rule did not provide extraterritorial income tax benefits beyond 2006. Specifically, the government explains that Congress, in 2006, was forced to repeal the savings clause for binding contracts in AJCA 101(f) after both section 101(d) and 101(f) were found by the WTO to provide prohibited export subsidies. Congress repealed section 101(f) but did not repeal 101(d). *See* Tax Increase Prevention and Reconciliation Act of 2005, Pub. L. No. 109-222, § 513(b), 120 Stat. 345, 366 (2006) ("TIPRA"). According to the government, it was not necessary to repeal section 101(d) because, as both Congress and the WTO understood, the transitional relief provided by section 101(d) would expire at the end of 2006.[11]

---

[11] In its decisions, the WTO agreed with the interpretation of the United States that the transition rule in AJCA section 101(d) limited extraterritorial income tax benefits to 2005 and 2006. *See* Panel Report, United States—Tax Treatment for "Foreign Sales Corporations"—Second Recourse to Article 21.5 of the DSU by the European Communities ¶ 7.60, WTO Doc. WT/DS108/RW2 (adopted Sept. 30, 2005) ("Pursuant to Articles 101(d) and (f) of the [AJCA], the [extraterritorial income tax] benefits remain available throughout 2005 and 2006 (albeit at reduced percentages), and indefinitely (in the case of certain transactions)."); *see also* Appellate Body Report, United States—Tax Treatment for "Foreign Sales Corporations"—Second Recourse to Article 21.5 of the DSU by the European Communities ¶ 6, WTO Doc. WT/DS108/AB/RW2 (adopted Feb. 13, 2006) (upholding the panel's findings and noting that "[s]ection 101(d) [of the AJCA] contains a 'transition provision', pursuant to which the [extraterritorial income] tax scheme remains available, on a reduced basis, for certain transactions in the period between 1 January 2005 and 31 December 2006"). The European Union shared the understanding that the United States would be in compliance with its WTO obligations, and the threat of sanctions would end, with the 2006 repeal of the AJCA's savings

The court agrees with the government that the legislative history and subsequent amendments to section 101 of the AJCA confirm that the tax benefits Congress provided under section 101(d) were limited to income recognized in 2005 and 2006.  With regard to DreamWorks's legislative history argument, the court cannot find any legislative history to suggest that, at any stage in drafting the transition rule for 2005 and 2006, Congress considered extending long-term tax relief for post-repeal transactions that would generate income beyond 2006.  The only legislative history that speaks to continued tax benefits for transactions after the repeal of the extraterritorial income tax regime is related to the savings clause for transactions entered into pursuant to a binding contract that pre-dated the repeal.  The House and Senate Committee reports and the Conference Committee report stated that "the [extraterritorial income tax] exclusion provisions *remain in effect* for transactions in the ordinary course of a trade or business if such transactions are pursuant to a binding contract" in effect before the repeal of the extraterritorial income tax exemption.  H.R. Rep. No. 108-755, at 265 (2004) (Conf. Rep.) (emphasis added); H.R. Rep. No. 108-548(I), at 114 (same); S. Rep. No. 108-192, at 10 (same).  The Senate Committee report also explained that the savings provision for binding contracts was designed to "grandfather[] existing contracts entered into under the [foreign sales corporation] and [extraterritorial income] tax regimes," which the report stated were "comprised primarily of long-term leasing arrangements."  S. Rep. No. 108-

---

provision for binding contracts and the expiration of the transition rule.  *See* Minutes of Meeting ¶¶ 78-79, WTO Doc. WT/DSB/M/212 (June 20, 2006).

192, at 9.  Congress focused in section 101 of the AJCA only on long-term tax relief with regard to agreements that were made before the extraterritorial income tax exemption was repealed.

With regard to the transition rule itself, the court recognizes that the House Committee report acknowledged that some transition relief was "necessary and appropriate" and that other WTO members had provided transition relief when bringing domestic laws into compliance with WTO obligations.  However, there is no evidence in the legislative history of the AJCA to suggest that Congress intended to adopt a long-term transition rule similar to the one adopted in the Bananas Dispute, as DreamWorks contends.  To the contrary, the Senate Committee when discussing the Bananas Dispute expressed disapproval of an extended transition period.  S. Rep. No. 108-192, at 8-9.

With regard to the 2014 amendment to section 101(d) of the AJCA in section 219 of the TIPA, the court recognizes that "[w]hen Congress amends legislation, courts must 'presume it intends [the change] to have real and substantial effect.'"  *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (citing *Stone v. INS*, 514 U.S. 386, 397 (1995)).  However, contrary to DreamWorks's contention, the plain language and structure of TIPA section 219 show only that Congress intended to make a technical correction to AJCA section 101(d) with retroactive effect, not that AJCA section 101(d) had continuing effect beyond 2006.  Title II of the TIPA, also known as the Tax Technical Corrections Act of 2014, made a number of clarifying amendments to tax-related statutes.  Many of these amendments, including the amendment to section 101(d) of the AJCA, provided that "[t]he amendments . . . shall take effect as if included in the provision of the [statute] to

which they relate." TIPA § 219(d).  TIPA section 219's retroactive technical correction to AJCA section 101(d) therefore had a real and substantial effect for taxpayers with open 2005 or 2006 returns.

The legislative history of the TIPA confirms this reading.  The text of section 219 of the TIPA is identical to section 19 of the House Committee on Ways and Means's Tax Technical Corrections Act of 2014, H.R. 5528, 113th Cong. (2014) (as referred to the Comm. on Ways and Means, Sept. 18, 2014) and section 18 of the Senate Finance Committee's Tax Technical Corrections Act of 2014, S. 2261, 113th Cong. (2014) (as reported by the S. Comm. on Fin., Apr. 28, 2014).  There is no legislative history available for the House Committee bill, but the Senate Committee report, S. Rep. No. 113-155, at 8 (2014), accompanying the bill indicated that the amendment to section 101(d) of the AJCA was not intended to change the "present law [that] any amount excluded from gross income pursuant to [the extraterritorial income tax regime] continues to be taken into account in determining" the tax deduction that was created by AJCA section 102.

Indeed, to the extent that subsequent legislation is at all relevant, the court finds Congress's decision in 2006 to repeal the savings clause in section 101(f) to be more significant.  Following a WTO decision that found both section 101(d) and 101(f) were protectionist, Congress repealed section 101(f) of the AJCA in section 513(b) of the TIPRA.  Congress, however, did not change section 101(d).  The court concludes that Congress's decision not to repeal section 101(d) reflects Congress's understanding that

section 101(d) was not a savings provision and that its transitional tax relief expired in

2006.[12]

## V.   CONCLUSION

For the reasons stated above, DreamWorks's motion for summary judgment is

**DENIED** and the government's cross-motion for summary judgment is **GRANTED**.

The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge

---

[12] The limited legislative history of the TIPRA's repeal of the savings clause for binding contracts in AJCA section 101(f) also indicates that Congress in 2006 understood that the transition rule in AJCA section 101(d) "phased out the [extraterritorial income] tax benefits over a 2-year period" by allowing taxpayers to "retain 100 percent of their exclusion benefits for transactions prior to 2005, 80 percent for transactions during 2005, and 60 percent for transactions during 2006."  152 Cong. Rec. S4440-41 (daily ed. May 11, 2006) (statement of Sen. Baucus, who also served on the Senate Committee on Finance and the Conference Committee that drafted the AJCA).  The purpose of the transition rule in AJCA section 101(d) was to give taxpayers a "soft landing."  *Id.* at S4441.  In contrast, the savings clause for binding contracts in AJCA section 101(f) was designed to protect companies that "relied on the extraterritorial income tax benefits when they entered contracts" prior to September 17, 2003. *Id.*